## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF PENNSYLVANIA

MARC J. COMER ESQ., *as Administrator*    )
*Ad Prosequendum and Administrator of the*  )
*Estate of CARLOS ABRAHAM MELENDEZ*  )
*HERNANDEZ, a/k/a CARLOS MELENDEZ*;  )
                                  )   Civil Action No. 23-1464
          Plaintiff,           )
                            )
       v.                     )

AMERICAN TRANSMISSION SYSTEMS,
INCORPORATED; AMERICAN
TRANSMISSION SYSTEMS,
INCORPORATED, *d/b/a FIRSTENERGY*;
FIRSTENERGY CORP.; FIRST ENERGY
OF PA, LLC; FIRSTENERGY SERVICE
COMPANY; PENN POWER COMPANY;
PENN POWER; OHIO EDISON; OHIO
EDISON COMPANY; WALLY KRAUSS,
MITCHELL BIASUCCI; MATT
STEINMETZ; MORRIS PAINTING, INC.;
JOHN DOES 1-20;  ABC CORPORATIONS
1-20,

          Defendants.

## <u>MEMORANDUM OPINION</u>

In his First Amended Complaint, Plaintiff Marc J. Comer ("Plaintiff"), as administrator ad prosequendum and administrator of the estate of Carlos Abraham Melendez Hernandez ("Melendez") seeks to address deficiencies in his original complaint that were identified by this Court at Oral Argument on Defendants' prior motions to dismiss.  The most significant problem with the original complaint was that it constituted a shotgun pleading.  Upon review of the First Amended Complaint ("FAC") it is apparent that, though Plaintiff's amended pleadings are significantly longer, the FAC bears too close a resemblance to the original complaint without the necessary curative amendments.  For that reason, the Court will grant Defendants' motions to

dismiss the claims against them, in part with prejudice and in part without prejudice, insofar as it is not yet totally apparent to this Court that giving Plaintiff one final opportunity to amend would be futile as to all Defendants.

## I.    <u>Background</u>

Melendez was working on a "transmission tower painting crew" for Defendant Morris Painting ("Morris")[1] at a site near 1701 Mohawk School Road in Edinburg, Pennsylvania on August 30, 2021.  (Docket No. 68, ¶ 59).  Morris had been hired to paint transmission towers by Defendant FirstEnergy Service Company ("FESC").  (Docket No. 45-2).[2]  As the Morris painters—including Melendez—were working on the morning of August 30th, they felt an electrical charge, "including hair stand[ing] up."  (Docket No. 68, ¶ 63).  Plaintiff alleges that representatives of Defendant utility companies "were on site at all relevant times controlling the work, including giving job directions to" the Morris painters, and that they "knew about this electrical charge … but did nothing other than to tell the painters to keep on painting."  (*Id.*).  Melendez was electrocuted and killed minutes later.  (*Id.*).  After his death, Melendez's parents settled a Pennsylvania Workers Compensation Act ("WCA") claim against Morris.  (Docket No. 73-1).

In the case before this Court, Plaintiff is the administrator of Melendez's estate, of which the sole beneficiaries are Melendez's parents.  (Docket No. 68, ¶ 3).  Plaintiff is pursuing damages against Morris, and against several electrical utility entities that are alleged to be linked to the

---

[1]    Plaintiff alleges that Morris was Melendez's W2 employer for workers' compensation purposes. (Docket No. 68, ¶ 26).

[2]    The Court may consider documents referenced throughout this Memorandum Opinion that are outside the pleadings but "integral to or explicitly relied upon in the complaint," or indisputably authentic documents attached by Defendants as an exhibit to the extent that Plaintiff's "claims are based on the document." *In re Rockefeller Ctr. Props., Inc. Sec. Litig.*, 184 F.3d 280, 287 (3d Cir. 1999) (cleaned up).

transmission tower painting project that resulted in Melendez's death, as well as three of those entities' employees who are alleged to have participated in the events leading to Melendez's death.

Defendants moved to dismiss the claims in Plaintiff's initial complaint, and the Court held Oral Argument on those motions.  (Docket No. 60).  The Court then granted those motions and dismissed all claims without prejudice because the original complaint was a classic "shotgun" pleading in that, in it, Plaintiff "assert[ed] multiple claims against multiple Defendants without specifying which of the Defendants [were] responsible for which acts or omissions, or which of the Defendants the claim [was] brought against."  (Docket No. 72 at 54).

Plaintiff subsequently amended and filed the FAC.  (Docket No. 68).  In the FAC, Plaintiff alleges that Defendants American Transmission Systems Inc. ("ATSI"), ATSI doing business as FirstEnergy, FirstEnergy Corp., First Energy of PA LLC, and FESC are "electrical utility corporations which do business within Lawrence County, Pennsylvania."  (*Id.* ¶ 6).  Plaintiff likewise alleges that "Penn Power Company and Penn Power" and "Ohio Edison and Ohio Edison Company" (*id.* ¶ 7-8 (emphases omitted)) are "electrical utility corporations which do business in Lawrence County, Pennsylvania."  (*Id.*).  Plaintiff groups all the utility corporations together as the "Utility Defendants" in making allegations against them.  (*Id.* ¶ 10).

Many allegations of wrongdoing levied against the Utility Defendants are phrased both in the collective and in the alternative.  Plaintiff alleges that: they "or any one of them … owned the electricity that killed … Melendez"; they "or any one of them … had a possessory interest in the electricity that killed … Melendez"; they "or any one of them … had substantial control over the electricity that killed … Melendez"; they "or any one of them … owned the transmission tower and/or the associated equipment that … Melendez came in contact with when he was killed"; they "or any one of them … had a possessory interest in the transmission tower and/or the associated

equipment that … Melendez came in contact with when he was killed"; they "or any one of them … had substantial control" of such transmission tower and/or equipment; they "or any one of them … operated the transmission tower, lines[,] and/or associated equipment that … Melendez came in contact with when he was killed"; they "or any one of them" owned, occupied, and controlled the land under the transmission tower and associated equipment; and they "or any one of them … owned and/or occupied the tower painting project" and "had a possessory interest in the tower painting project" that Melendez was working on when he was killed.  (*Id.* ¶¶ 12-23).  Plaintiff further alleges that the Utility Defendants "or any one of them" exercised "substantial control over **Morris Painting**, Carlos Melendez[,] and the tower painting project … Melendez was working on when he was killed" and that they or "one or more of them, qualified as and are considered an 'employer' or 'supervising agent of an employer' of … Melendez and **Morris Painting**."  (*Id.* ¶¶ 24-25 (emphases in original)).  He also alleges that the Utility Defendants (or any one of them) oversaw the safety compliance of the tower painting project.  (*Id.* ¶ 29).

These collective-and-in-the-alternative allegations are broad.  Plaintiff's more (though not necessarily sufficiently) specific allegations include that: the Utility Defendants gave OSHA investigators false and misleading information about Melendez's death and the tower painting project (*id.* ¶ 66); Defendant Wally Krauss ("Krauss") was onsite as a job inspector for First Energy/Penn Power (as an employee or contractor) and did not order work stopped when he saw the painters breaching a minimally acceptable distance from transmission lines (*id.* ¶¶ 44, 71-73, 209); Krauss instructed workers to continue working when they reported feeling electrical charges and he gave false information to OSHA investigators (*id.* ¶¶ 73, 75); Krauss "made sure" painters painted portions of the towers that "brought [them] well within the minimum distances of the live parts" (*id.* ¶ 74); Defendant Mitchell Biasucci ("Biasucci") saw Melendez and others on the

4

painting crew get too close to live power lines in the weeks just before Melendez's death but failed to use his authority to stop the work or ensure its safety (*id.* ¶¶ 78-80); and Defendant Matt Steinmetz ("Steinmetz") managed health and safety at FirstEnergy and was, among other things, expected to "actively develop and implement safety programs and policies" but failed to do so (*id.* ¶ 96).[3]

In the FAC, these allegations are distilled into five claims: (1) Negligence as to the Utility Defendants; (2) Negligence as to Biasucci; (3) Negligence as to Steinmetz; (4) Negligence as to Krauss; and (5) Negligence as to Morris.  In support of his negligence claim against the Utility Defendants, Plaintiff asserts that they "had substantial duties under the law with respect to the killing quality of its high voltage electricity and associated facilities and equipment."  (*Id.* ¶ 98). Plaintiff further alleges that the Utility Defendants breached their duties and that this resulted in the death of Melendez.  (*Id.* ¶ 99).  Among their alleged failings, Plaintiff alleges that the Utility Defendants: "failed to comply with various federal and state safety statutes and regulations, industry standards, failed to comply with local building ordinances and permits, failed to properly supervise the construction, failed to demand and insure that construction proceed in compliance with the Uniform Construction Code and other applicable codes and standards, failed to comply with ordinary and customary safety procedures common in the industry … [and] failed to maintain the property and work site in a reasonably safe condition."  (*Id.* ¶ 113).  Plaintiff further alleges that one or more of the Utility Defendants allowed "an unreasonably dangerous condition" to exist on the property by "failing to de energize the system."  (*Id.* ¶ 116).  Plaintiff also alleges that the Utility Defendants as the "host employer" were "supposed to make sure that **Morris Painting** had a properly qualified and trained Designated Safety Supervisor on site, but did not."  (*Id.* ¶ 139).

---

[3]     Plaintiff refers to "First Energy" or "FirstEnergy" in the FAC without identifying specifically *which* First Energy Defendant he intends to identify (there are four).

Plaintiff adds that the Utility Defendants are liable for the negligent hiring of Morris, and negligent supervision thereof, which ultimately led to the death of Melendez.  (*Id.* ¶¶ 147-48).

As for Biasucci, Plaintiff alleges that he had substantial control over Morris and Melendez for this project and that he did not ensure that the ultrahazardous activity taking place complied with applicable standards.  (*Id.* ¶¶ 176-79).  Beyond that, the gist of the allegations against Biasucci are that he knew the Morris crew was painting towers with the power on, but took no steps to stop the work or otherwise prevent ultrahazardous activity.  (*Id.* ¶ 180-83).  For Steinmetz, Plaintiff alleges that he had substantial control over the transmission tower and lines that killed Melendez.  (*Id.* ¶ 188).  The allegations about Steinmetz in this regard are largely parallel to the allegations against Biasucci.  With respect to Steinmetz's role, Plaintiff alleges that Steinmetz had a duty to engage employees and Morris to proactively promote safety but failed to ensure applicable standards were enforced, which eventually led to Melendez's death.  (*Id.* ¶¶ 206-07).  The negligence claim against Krauss is predicated on the allegation that Krauss oversaw safety compliance at the project site, that he saw the workers getting too close to the towers they were painting (*id.* ¶¶ 217-18), and that he was told by the painters that they were feeling sensations of electrical charge.  (*Id.* ¶ 220).  Plaintiff alleges that when the Morris painters reported they were feeling an electrical charge, Krauss told them to continue working.  (*Id.*).  Plaintiff also alleges that Krauss gave false information to the OSHA investigator who evaluated Melendez's death.  (*Id.* ¶ 222).

Finally, with respect to Morris, Plaintiff alleges that Morris agreed to waive immunities, including its Worker's Compensation immunity, in the Painting Contract.  (*Id.* ¶ 225).  Plaintiff alleges that in signing that contract, Morris "waived any and all immunities they would receive under Workers Compensation, including immunity from Plaintiff filing this suit."  (*Id.* ¶ 226).

Plaintiff argues that it was Morris's "negligence, carelessness, flagrance, gross negligence, and/or recklessness" that caused Melendez's family to lose the economic value of his life expectancy. (*Id.* ¶ 227). Specifically Plaintiff alleges that Morris knowingly violated applicable safety standards, including its own safety standards in having Melendez paint a transmission tower while a live current travelled through the structure. (*Id.* ¶ 229).

Defendants now move to dismiss the FAC Claims (Docket Nos. 73, 78)[4] and Morris also moves for sanctions (Docket No. 76), arguing that Plaintiff's FAC continues to exhibit characteristics of shotgun pleadings, an issue this Court addressed at Oral Argument and in its ruling on the first round of motions to dismiss in this case. The motions are fully briefed (Docket Nos. 74, 75, 77, 79, 81-84, 87).

## II.    Legal Standard

In considering a Rule 12(b)(6) motion to dismiss, the factual allegations contained in the complaint must be accepted as true and must be construed in the light most favorable to the plaintiff; the Court must also "determine whether, under any reasonable reading of the complaint, the plaintiff may be entitled to relief." *Phillips v. County of Allegheny*, 515 F.3d 224, 231 (3d Cir. 2008) (quoting *Pinker v. Roche Holdings Ltd.*, 292 F.3d 361, 374 n.7 (3d Cir. 2002)); *see Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 563 n. 8 (2007). While Federal Rule of Civil Procedure 8(a)(2) requires only "a short and plain statement of the claim showing that the pleader is entitled to relief," the complaint must "give the defendant fair notice of what the . . . claim is and the grounds upon which it rests." *Phillips*, 515 F.3d at 231 (quoting *Twombly*, 550 U.S. at 555). Moreover, while

---

[4]    Defendant Steinmetz does not appear to have moved to dismiss the claim against him, nor does it appear that his interests are being represented by any other Defendant in the matter. The same goes for Penn Power Company. For that reason, when this Court enters appropriate orders on the motions to dismiss and motion for sanctions, the Court will also order the parties to submit a joint status report concerning Steinmetz and Penn Power Company.

this standard does not require "detailed factual allegations," Rule 8 "demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citing *Twombly*, 550 U.S. at 555). To survive a motion to dismiss, "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Id.* (quoting *Twombly*, 550 U.S. at 570). The Supreme Court has noted that a "claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* (citing *Twombly*, 550 U.S. at 556). The requirement that a court accept as true all factual allegations does not extend to legal conclusions; thus, a court is "not bound to accept as true a legal conclusion couched as a factual allegation." *Iqbal*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 555).[5]

## III.  **Discussion**

In assessing the present iteration of Plaintiff's allegations in the FAC, the Court has determined that they are—as the Court alluded to above—still excessively broad and non-specific unto the point of approaching another shotgun pleading. Herein, the Court will first address that most general shortcoming of the FAC. The Court will then address Defendants' other arguments for dismissing claims against them, which include failure to allege facts in support of the elements of a negligence claim, failure to allege adequate participation for individual liability, preemption, res judicata, and other arguments.

---

[5]     Plaintiff's FAC contains lengthy sections dedicated to legal analysis of, among other things, the "duty recognized by long standing Pennsylvania Supreme Court case law and statutes" concerning electrical safety standards. (Docket No. 68 at 9-13, 26-29). The Court has taken such sections of the FAC under advisement in its consideration of Plaintiff's opposition to the motions to dismiss; however, the Court does not afford Plaintiff's legal statements and arguments in the FAC the same presumption for truth that attaches to Plaintiff's factual allegations.

<u>The Utility Defendants</u>

Regarding the FAC as a whole, the Utility Defendants argue that the allegations in it are even more deficient than those in the original complaint.  (Docket No. 79 at 7 ("Even more so than the initial Complaint, the Amended Complaint is an abusive shotgun pleading rife with conclusory allegations and legal jargon without factual support specific to the claims against each Defendant.")).  The Utility Defendants argue that, like the allegations in the original complaint, the allegations in the FAC are collective allegations without distinction as to the roles played by each of the Utility Defendants.  The Court largely agrees.

A complaint constitutes an improper shotgun pleading where it "includes pleadings that contain multiple counts where each count adopts the allegations of all preceding counts and *assert[s] multiple claims against multiple defendants without specifying which of the defendants are responsible for which acts or omissions*, or which of the defendants the claim is brought against."  *Milo, LLC v. Procaccino*, No. CV 16-5759, 2020 WL 1853499, at *10 (E.D. Pa. Apr. 13, 2020) (quoting *Bartol v. Barrowclough*, 251 F. Supp. 3d 855, 859 (E.D. Pa. 2017)) (emphasis added).  While it is not the case that every complaint that asserts multiple claims against multiple defendants is a shotgun pleading, complaints will be assessed as improper shotgun pleadings where they fail to provide "defendants adequate notice of the claims against them and the grounds upon which each claim rests."  *Id.* (quoting *M.B. v. Schuylkill Cty.*, 375 F. Supp. 3d 574, 587 (E.D. Pa. 2019)).

The allegations in the FAC about the Utility Defendants continue to leave at least some of these Defendants guessing as to how Plaintiff alleges they were individually involved in bringing about Melendez's death through their negligence.  For certain Utility Defendants, their alleged role is clear enough from context.  For instance, in the Painting Contract by which Morris took on the

transmission tower project in question, the contracting party on the defense side is identified as Defendant FESC.  (Docket No. 45-2).  The Utility Defendants indicate in their motion to dismiss that FESC was acting as ATSI's agent for purposes of that contract with Morris.  (Docket No. 79 at 3).  Unlike FESC and ATSI, it is unclear how other Utility Defendants fit into the picture other than the general allegations that they—with, or as opposed to, all the Utility Defendants—controlled the land, the electricity, the transmission towers, or the work with respect to the painting project that led to Melendez's death.  Plaintiff alleges that all the Utility Defendants are "part of a common organization and in fact and in practice do not maintain consistent nor clear lines of separation of their corporate form or corporate activities," (Docket No. 68, ¶ 11), but Plaintiff does not allege facts to show what he means by that vague statement, and there are indicia in indisputably authentic records that make it difficult to imagine how certain Defendants were involved.  For instance, in the Utility Defendants' motion to dismiss they reveal that FE Corp. is merely a holding company, and they attach a Form 10-K indicating the same.  Aside from the all-Utility-Defendants allegations, there are no allegations that show a relationship between FE Corp. and Morris or Melendez from which a duty to Melendez could arise.  The Utility Defendants also argue that Ohio Edison Co. is an Ohio electric utility company that does business in Ohio, and there is no relationship among it and the deceased or his employer from which a duty of care could arise.  The Utility Defendants further argue that ATSI *d/b/a* FirstEnergy does not exist, First Energy of PA LLC does not exist, Penn Power does not exist, and Ohio Edison does not exist.  (Docket No. 79 at 3-4; 9-10).

Plaintiff barely responds to these arguments about some of the Utility Defendants being nonexistent.  (Docket No. 84 at 7 (arguing that the Utility Defendants are a "conglomerate which appear to do business under the 'FirstEnergy' trademark")).  A plaintiff's "failure to respond to an

argument advanced in support of a motion to dismiss results in a waiver of the claim sought to be dismissed." *Rapid Models & Prototypes, Inc. v. Innovated Sols.*, 71 F. Supp. 3d 492, 506 (D.N.J. 2014). And even where there is not outright failure to respond and waiver, a "passing reference" to an issue is not an adequate response. *Von Evans v. Brittian*, No. 22-CV-312, 2024 WL 219231, at *1 n. 1 (E.D. Pa. Jan. 19, 2024). Plaintiff generally argues that "group pleading" is permissible insofar as pleadings give adequate notice to defendants of the allegations against them. *Corbin v. Bucks Cnty.*, 703 F. Supp. 3d 527, 533 (E.D. Pa. 2023) ("Irrespective of whether these allegations are sufficient to state a claim for which relief may be granted, they permit each defendant named in the Amended Complaint to understand the nature of the allegations levied against them. Thus, they may not be categorically dismissed as 'group pleading.'"). However, the Court does not agree that Plaintiff's pleadings fall into the category of sufficiently specific, and therefore permissible, group pleadings.[6]

Even if the existence and roles of all the Utility Defendants *were* clear enough in the FAC, the Court would dismiss the negligence claim against the Utility Defendants because Plaintiff's allegations supporting the elements of negligence are inadequate. To "prevail in a negligence action," a party must establish that: (1) "the defendant owed a duty of care to the plaintiff"; (2) "that duty was breached"; (3) "the breach resulted in the plaintiff's injury"; and (4) "the plaintiff suffered an actual loss or damages." *Merlini ex rel. Merlini v. Gallitzin Water Auth.*, 980 A.2d 502, 506 (Pa. 2009).[7] The first element—whether a defendant owes the plaintiff a duty of care

---

[6]    At Oral Argument for the last round of motions to dismiss, the Court warned Plaintiff that he would need to do more than repeat each allegation in relation to each Defendant. Despite that exchange, many of the allegations in the FAC are formalistically repetitive as to each Defendant.

[7]    The Court notes that while the Painting Contract contains a "Governing Law, Jurisdiction, and Venue" provision that identifies Ohio law as applicable to any "dispute between the parties" (Docket No. 45-2 at 13)—the parties to that contract being Morris Painting and FESC as ATSI's agent—the parties assume in their briefing that Pennsylvania law applies to this matter between Plaintiff and Defendants. The

"requiring the [defendant] to conform to a certain standard of conduct for the protection of others against unreasonable risks" is a "question of law." *In re TMI*, 67 F.3d 1103, 1117 (3d Cir. 1995) (quoting *Griggs v. BIC Corp.*, 981 F.2d 1429, 1434 (3d Cir. 1992), *abrogated by Surace v. Caterpillar, Inc.*, 111 F.3d 1039 (3d Cir. 1997)).

Insofar as the Utility Defendants are alleged to be landowners, a "landowner's duty to entrants upon the land … depends upon the entrant's status as an invitee, a licensee, or a trespasser." *Gay v. A.O. Smith Corp.*, 586 F. Supp. 3d 354, 359 (W.D. Pa. 2022). Employees of independent contractors are business invitees. *Id.*; *McDonald v. Lowe's Companies, Inc.*, No. CIV.A. 08-CV-219, 2009 WL 3060413, at *5 (E.D. Pa. Sept. 24, 2009) (explaining that in Pennsylvania, "employees of independent contractors working on, or in control of, premises owned by another are considered business invitees"). A landowner's duty to such an invitee is to warn them of any dangerous condition involving an unreasonable risk of harm of which the landowner: (1) knows or by exercise of reasonable care could have discovered; (2) should have expected the invitee would not discover; and (3) fails to exercise reasonable care to protect the invitee from it. *Rabovsky v. Foster Wheeler*, LLC, No. CIV.A. 2:10-03202-ER, 2012 WL 2913805, at *1 n.1 (E.D. Pa. June 8, 2012) (quoting *Summers v. Giant Food Stores, Inc.*, 743 A.2d 498, 506 (Pa. Super. Ct. 1999)). That said, under Pennsylvania law, a defendant "who hires an independent contractor is generally exempt from liability for injuries sustained by the contractor's employees" with respect to "conditions that are at least as obvious to the contractor and its employees as they are to the landowner." *Beil v. Telesis Const.*, Inc., 11 A.3d 456, 460 (Pa. 2011). When that is the case, the landowner-defendant is not duty-bound to warn the contractor or its employees. Additionally, the "owner of the property is … under no duty to protect the employees

---

Court, having no reason to believe that Pennsylvania law would not apply to the parties to this dispute, therefore applies Pennsylvania law herein.

of an independent contractor from risks arising from or intimately connected with defects or hazards which the contractor has undertaken to repair or which are created by the job contracted." *Rabovsky*, 2012 WL 2913805, at *1 n. 1.

Insofar as the Utility Defendants are alleged to be the employers of an independent contractor, there are exceptions to the "general rule of nonliability," *i.e.*, the general rule that the independent contractor and its employees—rather than the person or entity who hires the independent contractor—are liable for the employees' safety. *Gay*, 586 F. Supp. 3d at 361. Exceptions to this general rule include the "retained control" exception and the "peculiar risk" exception. *Chenot v. A.P. Green Servs., Inc.*, 895 A.2d 55, 64 (Pa. Super. Ct. 2006). The retained control exception applies when "a property owner who hires an independent contractor retains control of the means and methods of the contractor's work." *Id.* Control in this context does not mean any control, that is, it is not enough to show that the defendant landowner "has merely a general right to order the work stopped or resumed, to inspect its progress or to receive reports, to make suggestions or recommendations which need not necessarily be followed, or to prescribe alterations and deviations." *Id.* (quoting Restatement (Second) of Torts § 414, cmt. c)); *Nertavich v. PPL Elec. Utilities*, 100 A.3d 221, 227 (Pa. Super. Ct. 2014), *aff'd*, 124 A.3d 734 (Pa. 2015). The peculiar risk exception applies when there are "unusually dangerous circumstances" of the work being done that "involv[e] a special danger or peculiar risk." *Beil*, 11 A.3d at 467; *Gay*, 586 F. Supp. 3d at 363 ("a peculiar risk of physical harm" (citing Restatement (Second) of Torts §§ 416, 427)). The peculiar risk exception is narrow and context-dependent insofar as it does not apply when the risk associated with the work is "no different from the usual or ordinary risk associated with [such] work." *Id.* To illustrate, the risk of a crocodile bite may be peculiar, but not for an independently contracted crocodile hunter.

13

Plaintiff's allegations do not show that the Utility Defendants had "superior knowledge," *Chenot*, 895 A.2d at 64, of a dangerous condition, nor that the retained control or peculiar risk exceptions to general non-liability of employers of independent contractors applies.[8]  According to the Painting Contract, Morris was to "furnish all supervision, experienced and qualified labor, equipment, tools, [and] materials." (Docket No. 45-2 at 4).  In Article 2, Section D of the contract, the parties agreed that Morris was an independent contractor with full responsibility for acts or omissions of its employees and that it alone would be "responsible for the manner and methods by which the Work is performed." (*Id.* at 8).  Regarding Morris's employees and the safety of the work, in Article 6 of the contract, the parties agreed that Morris would be "responsible for the manner and methods by which the Work is performed and for materials, workforce and equipment, irrespective of whether any changes are made as a result of comments received from [FESC]." (*Id.* at 9).  And, regarding the safety of the work, the parties agreed that Morris "shall conduct the Work in a manner to avoid risk of bodily harm to persons or damage to property" and "take all precautions necessary and shall be solely responsible for the safety of the Work and the safety and adequacy of the manner and methods it employs in performing the Work." (*Id.*).  Based on that negotiated delegation of responsibilities, a retained control exception on the face of the contract cannot be alleged.

That begs the question of whether Plaintiff's allegations show "that the land owner exercised actual control over the work" despite contractually handing over control. *Nertavich*, 100

---

[8]    Plaintiff cites *Colloi v. Philadelphia Elec. Co.*, 481 A.2d 616, 620 (Pa. Super. Ct. 1984) in which the court decided that the question of whether an employer breached the duty to warn an independent contractor of the existence of an underground power line should have gone to the jury where the independent contractor would have had no reason to believe a utility line ran so close to a water pipe under repair while the employer had blueprints, charts, and diagrams of electrical lines running from the substation at its disposal.  In *Colloi*, there were facts supporting non-obviousness of danger.  Here, there are no factual allegations of non-obviousness of danger.

14

A.3d at 228.  To that end, Plaintiff has alleged: that the Utility Defendants controlled the electricity and transmission tower related to Melendez's death (Docket No. 68, ¶¶ 14-15); had "substantial control over Morris Painting, Carlos Melendez and the tower painting project [he] was working on when he was killed" (*id.* ¶ 24); Utility Defendant employee Biasucci had control over Morris, Melendez, and the project (*id.* ¶ 34); Utility Defendant employee Steinmetz had control over Morris, Melendez, and the project (*id.* ¶ 41); Utility Defendant employee/independent contractor Krauss had control over Morris, Melendez, and the project, and shouted at the workers to keep painting despite feeling an electrical charge shortly before Melendez's death (*id.* ¶ 73); and the Defendants (all of them) were responsible to provide Melendez with a safe work environment (*id.* ¶ 106).  These allegations concerning the Utility Defendants' duty to Melendez are fact-deficient, mostly consisting of legal conclusions stated without factual support.  While Plaintiff states that the Utility Defendants had control over the electricity, the land, the transmission towers, or even the work itself, these pleadings consist of conclusory assertions rather than factual allegations. *Fedor v. Van Note-Harvey Assocs.*, No. CIV.A. 10-5110, 2011 WL 1085993, at *3 (E.D. Pa. Mar. 18, 2011) ("His complaint does not allege any facts to suggest how Wentworth or Yardley retained control over the roofing project. Without more, plaintiff fails to state 'enough facts to raise a reasonable expectation that discovery will reveal evidence' that Wentworth and Yardley should be held liable pursuant to the retained control exception.").

Regarding the peculiar risk exception, Plaintiff's allegations establish that Melendez was exposed to a risk of electrocution.  Plaintiff argues that the peculiar risk of electrocution imposed a heightened standard of care on the Utility Defendants because courts in Pennsylvania have held that "the standard of care imposed upon a supplier of electric power, particularly when that power is supplied at high voltage, is among the highest recognized in the law of negligence." *Densler v.*

*Metro. Edison Co.*, 345 A.2d 758, 761 (Pa. Super. Ct. 1975). Such standard requires an electric power supplier to "use the very highest degree of care practicable to avoid injury to everyone who may be lawfully in proximity to its wires, and liable to come accidentally or otherwise, in contact with them." *Id.* However, while electric power suppliers are held to a high standard of care, courts in Pennsylvania have also explained that when there are risks inherent in certain professions, such risks cannot be said to be outside the expected risks for those employed in such professions. *See Fedor*, 2011 WL 1085993, at *3 (discussing *Best Prods. Co. v. A.F. Callan & Co.*, No. CIV. A. 90-5329, 1997 WL 83737, at *11 (E.D. Pa. Feb. 26, 1997), and explaining that the risk of falling through a deteriorating roof was not outside the ordinary level of risk for a roofing contractor). That is, as explained above, peculiar risks only arise when there is a risk that is "foreseeable to the owner at the time the contract is executed …, [and] *the risk is different from the usual and ordinary risk associated with the general type of work done*." *Zuno v. Wal-Mart Stores, Inc.*, No. CIV A 06-2392, 2009 WL 1545258, at *10 (E.D. Pa. May 29, 2009) (quoting *Warnick v. Home Depot U.S.A., Inc.*, 516 F. Supp. 2d 459, 469 (E.D. Pa. 2007)) (emphasis added). In this case, the peculiar risk exception does not apply to Melendez with respect to the risk of electrocution when he was employed on a team of painters engaged in the painting of transmission towers.[9]

---

[9]    In *Motter v. Meadows Ltd. P'ship*, 680 A.2d 887 (Pa. Super. Ct. 1996), the Superior Court of Pennsylvania considered a similar issue when it reviewed a summary judgment decision in favor of the employer of an independent contractor whose employee was injured when a trench he was working in collapsed on him. Explaining the application of the peculiar risk exception to the general non-liability of an employer of an independent contractor, the Superior Court explained that "[e]xcavation of a sewage trench brings … attendant risks, one of which is collapse of the trench walls." *Id.* at 891. Because such risk was "obvious and unavoidable," the Superior Court determined that the trial court had not erred in "finding that cave-in of a sewer trench is not an unusual or unexpected risk, but rather, is a risk faced by excavating companies every day." *Id.* at 892. The plaintiff in that case had argued that because the Occupational Safety and Health Administration (OSHA) had set safety standards for work with the soil involved in that collapse, it meant that the risk posed by digging that trench was especially dangerous, *i.e.*, peculiar. But the Superior Court explained that was not the case; rather, the work was made unsafe by the independent contractor's "failure to abide by the OSHA rules and regulations," and the employer of the independent contractor could not be held responsible for the contractor's failure to follow OSHA requirements. *Id.* Similar to the facts in *Motter*, Plaintiff alleges that Morris and Melendez's work was

Plaintiff has raised a few additional arguments in opposition to the Utility Defendants' motion to dismiss that bear addressing before the Court moves on to address the allegations against the other Defendants. In one instance, regarding the peculiar risk exception, Plaintiff argues that Morris was unaware of the dangers of its work because it was an incompetent contractor. (Docket No. 68, ¶¶ 113, 147 (alleging that the Utility Defendants hired a "safety incompetent contractor")). But there are no well-pleaded facts in the FAC that support that characterization of Morris. Not only that, but under Pennsylvania law, liability for failure to "employ a competent and careful contractor" is "limited to claims by third persons other than employees of the negligent independent contractor itself." *Fedor*, 2011 WL 1085993, at *4 (quoting *Mentzer v. Ognibene*, 597 A.2d 604, 609 (Pa. Super. Ct. 1991)).

Plaintiff also argues that the Utility Defendants owed Melendez a duty of care under 43 P.S. § 26-2, pursuant to which "[n]o employer or supervising agent of an employer shall require or permit an employee to … participate in the … maintenance … of high-voltage lines having a voltage differential in excess of nominally 13,200 volts between any pair of conductors or in excess of nominally 7,600 volts between any conductor and ground" without de-energizing conductors or using other approved methods. *Id.* Plaintiff argues that § 26-2 applies to Melendez's circumstances, saying Plaintiff "specifically alleged that the Utility Defendants qualify as either an 'employer' or 'supervising agent of an employer' in the Amended Complaint, which must be taken as true." (Docket No. 84 at 9). Plaintiff goes on to explain that the Utility Defendants employed Morris and were "the supervising agent of … Morris Painting," particularly where

---

subject to OSHA standards. (Docket No. 68, ¶ 113). An OSHA investigation into Melendez's death confirmed that Morris violated applicable OSHA standards. (Docket No. 79-4). According to the allegations and integral documents that this Court is permitted to consider in assessing the allegations in the FAC, Plaintiff has not factually alleged that Melendez's accident "would have occurred" even if the "proper safety precautions" were taken. *Motter*, 680 A.2d at 892. Thus, the peculiar risk exception is not implicated by these pleadings.

Krauss and others are alleged to have supervised the work. (*Id.*). However, according to Pennsylvania law, "the relationship between a party who contracts for services and an independent contractor is not that of employer-employee as understood by the law." *Dunkle v. Middleburg Mun. Auth.*, 842 A.2d 477, 481 n. 8 (Pa. Commw. Ct. 2004).[10] For that and the other foregoing reasons, the Court will dismiss the negligence claim against the Utility Defendants. The dismissal will be without prejudice for the reasons further stated herein.

<u>Wally Krauss</u>

With Krauss, Plaintiff's allegations are more specific than they are with respect to the other Defendants. In the FAC, Plaintiff alleges that Krauss worked for First Energy/Penn Power, either as an employee or as a contractor. (Docket No. 68, ¶ 209).[11] It is alleged that his job was to be an onsite job inspector. (*Id.*). Plaintiff alleges that Krauss had substantial control over: the electricity that killed Melendez; the transmission tower, lines, and associated equipment Melendez touched when killed; the land under the relevant transmission tower and associated equipment; and Morris. (*Id.* ¶¶ 210-13). Plaintiff further alleges that Krauss participated in the negligent conduct that killed Melendez not least of all because Krauss was on site at "all relevant times," was responsible for "monitoring the painting project, with respect to safety compliance," and—critically—that Krauss "shouted up to [the Morris painters] to continue working" shortly before Melendez was

---

[10]      In some respects, Plaintiff's policy arguments about various duties owed by Defendants—particularly the Utility Defendants—to Melendez, would be more appropriately addressed to the Pennsylvania General Assembly than to this Court. For instance, Plaintiff argues in opposition to Morris's motion to dismiss that the "Utility Defendants should have either shut the power off and/or had the work done by specialized utility crews that are trained and qualified to get that close to high voltage wires, like the ones that were assigned to" recover Melendez's body. (Docket No. 75 at 1). Regardless of whether such safety measures are reasonable, Plaintiff fails to cite existing law setting a standard that would, for instance, have required the Utility Defendants to shut down the towers being painted.

[11]      From this allegation about Krauss's employment, it is hard to tell which Defendant corresponds to "First Energy." Clarification in the pleadings on this point is something that Plaintiff should address should he choose to amend.

electrocuted and killed as "Kraus[s] was on site watching the ongoing painting work." (*Id.* ¶¶ 216-17, 220).

To the extent that Plaintiff alleges Krauss was an employee of one of the Utility Defendants, a claim of negligence against one or more of the Utility Defendants who employed him based on *respondeat superior* might be tenable.[12]  However, on these pleadings it is unclear on what, if any, authority Krauss told Melendez and other workers to continue working after they indicated that they felt an electrical charge.  Plaintiff's allegations of Krauss and his employer's control of the Morris painting project are sparse and conclusory, which the Court addressed above in its assessment of the adequacy of allegations against the Utility Defendants.  Should Plaintiff supply allegations of *fact* rather than conclusory statements about Krauss and his employer's retention of control of the worksite, then amendment would perhaps not be futile.

Additionally, for Plaintiff's claim against Krauss personally, the Court likewise determines that amendment is not clearly futile.  "Under Pennsylvania law, although an officer or agent of a corporation who takes no part in the commission of a tort committed by the corporation is not individually liable to third parties for such a tort, such an officer or agent may be held liable in tort under the 'participation theory.'"  *Sherfey v. Johnson & Johnson*, No. CIV.A. 12-4162, 2014 WL 715518, at *6 (E.D. Pa. Jan. 29, 2014) (quoting *Wicks v. Milzoco Builders, Inc.*, 470 A.2d 86, 90 (Pa. 1983)).  Under the participation theory, to impose liability on an employee, a "plaintiff must establish that the individual officer or agent engaged in misfeasance rather than mere nonfeasance," that is, the officer/agent improperly performed as opposed to "fail[ed] to act."  *Id.*  Plaintiff currently alleges that Krauss shouted up to Melendez and others to keep working though

---

[12]    Plaintiffs may plead in the alternative.  Fed. R. Civ. P. 9(d)(2)-(3).  Thus, the Court assesses allegations about Kraus as an employee separately from allegations about Kraus as an independent contractor, without construing one theory as necessarily undermining the other.

they felt an electric charge.  Such allegations could support a prima facie case of liability for negligence against Krauss personally if Plaintiff can allege facts showing Krauss had authority to control that work.  Because there are no non-conclusory allegations in the FAC presently that show what (if any) authority Krauss had to give direction to the Morris painters, the Court will dismiss the claim against Krauss without prejudice.

Mitchell Biasucci

With respect to Biasucci, Plaintiff alleges that he was a "supervisor for the jobsite on behalf of the **Utility Defendants**, or one or more of them, at which Plaintiff was injured." (Docket No. 68, ¶ 30).  Other allegations against Biasucci in the FAC are quite vague or merely provide conclusory descriptions of Biasucci's alleged involvement in bringing about Melendez's death through negligence.  For instance, Plaintiff alleges that Biasucci had "substantial control over the electricity that killed … Melendez," the "transmission tower, lines and/or associated equipment that … Melendez came in contact with when he was killed," "the land upon which the transmission tower and associated equipment that … Melendez came in contact with when he was killed was located," and over "Morris Painting." (*Id.* ¶¶ 31-34).  Plaintiff further alleges that Biasucci was "on site at various relevant times with full knowledge of and participation in the matters set forth herein," that he was "charged with the responsibility of managing the painting project, including with respect to safety compliance," that he knew the Morris painters were painting towers with the power on, that he watched Melendez and others paint the "hot towers," and that he saw them breach the minimum allowable distance. (*Id.* ¶¶ 76-78).  Plaintiff also alleges that Biasucci "had the opportunity, position and authority, but did nothing to stop the work or otherwise exercise his

20

authority to prevent the ongoing ultrahazardous safety violations which resulted in the death of …
Melendez." (*Id.* ¶ 79).[13]

These allegations do not amount to a plausible showing of Biasucci's personal negligence.
As indicated above, Pennsylvania law permits liability against a corporate employee individually
pursuant to the participation theory. *Sherfey*, 2014 WL 715518, at *6 (quoting *Wicks*, 470 A.2d at
90). But participation theory requires a showing that an employee engaged in misfeasance, not
just nonfeasance, *i.e.*, not just "omitting to do or not doing something" he or she should have done.
*Greenberg v. Macy's*, No. CIV.A. 11-4132, 2011 WL 4336674, at *4 (E.D. Pa. Sept. 15, 2011)
(citing *Wicks*, 470 A.2d at 90 and *Nelson v. Duquesne Light Co.*, 12 A.2d 299, 303 (Pa. 1940)).
Plaintiff's allegations are quite plainly about what Biasucci is alleged to have failed to do. Not
only that, but there are not even clear allegations that Biasucci was present at Melendez's worksite
at the time of his death.

In response to Defendants' motion to dismiss the claim against Biasucci, Plaintiff argues
that it is enough that he has alleged Biasucci "planned, oversaw and managed the project, including
having the towers painted live in violation of the law." (Docket No. 84 at 23). However, Plaintiff
has not pointed to a particular applicable law that made it illegal to paint towers live. According
to the FAC, Plaintiff clearly believes it is unconscionably dangerous to not de-energize towers
before having them painted (*see, e.g.*, Docket No. 68, ¶ 65). But, again, Plaintiff has not pointed
to a particular law against painting live towers. Moreover, with respect to Biasucci in particular,
the allegations that he had control over that decision or the work more generally are conclusory
and nonspecific. Plaintiff's allegations do not plausibly show Biasucci's negligence by

---

[13]    Defendants point out that, at Oral Argument, Plaintiff indicted that Biasucci was "in the truck
watching" events unfold at the time of Melendez's death; however, such an allegation does not appear in
the FAC. (Docket No. 72 at 14).

misfeasance; therefore, the Court will dismiss the claim against Biasucci. The claim will be dismissed without prejudice should Plaintiff be able to allege facts showing misfeasance on his part. Given Plaintiff's failure to allege certain facts about Biasucci in the FAC that were alluded to at Oral Argument, the Court is somewhat reticent to provide this final opportunity for amendment as to Biasucci. However, out of an abundance of caution that Plaintiff may be able to meaningfully amend such allegations, the Court's dismissal will be without prejudice.

<u>Morris Painting</u>

Morris seeks dismissal of Plaintiff's negligence claim against it with prejudice, arguing that because it was Melendez's employer, it is immune from Plaintiff's suit pursuant to 77 P.S. § 481(a).[14]   Morris also argues that because Melendez's parents, through counsel and in Melendez's name, settled a WCA claim, and the settlement was approved by an Order and Decision from a Worker's Compensation Judge with a compromise and release agreement and death claim supplement, under Pennsylvania law and res judicata, Morris was released from any and all other liability associated with Melendez's death. Plaintiff opposes the motion to dismiss

---

[14]      Morris also argues that Plaintiff effectively conceded that Morris was subject to the exclusive remedy provisions of the WCA at Oral Argument on the prior motions to dismiss and that Plaintiff should be barred from—and sanctioned for—attempting to revive this claim now. While the Court acknowledges that Plaintiff seemed to cede exclusivity of the WCA remedy on the last go-around, the Court adds that Plaintiff did not commit to that representation. (Docket No. 72 at 34 ("Maybe discovery will show something else[.]")). The law-of-the-case doctrine prevents reconsideration of legal decisions in the same case. *Home Depot USA, Inc. v. Lafarge N. Am.*, Inc., 59 F.4th 55, 61 (3d Cir. 2023). That said, the law-of-the-case doctrine doesn't keep the Court from reconsidering its own decisions, so "interlocutory orders … remain open to trial court reconsideration, and do not constitute the law of the case." *United States ex rel. Petratos v. Genentech Inc.*, 855 F.3d 481, 493 (3d Cir. 2017) (citing *Williams v. Runyon*, 130 F.3d 568, 573 (3d Cir. 1997), and quoting *Perez-Ruiz v. Crespo-Guillen*, 25 F.3d 40, 42 (1st Cir. 1994)). Additionally, the law of the case "directs [this Court's] exercise of discretion" rather than limiting its authority. *United States v. Bhimani*, No. 22-1436, 2023 WL 5125056, at *3 (3d Cir. Aug. 10, 2023) (quoting *Pub. Int. Rsch. Grp. of N.J., Inc. v. Magnesium Elektron, Inc.*, 123 F.3d 111, 116 (3d Cir. 1997)). In this matter, in which the Court previously dismissed all claims, including the claim against Morris *without prejudice* to amendment, the law of the case does not bar the Court's consideration of whether Plaintiff has, in his FAC, stated a plausible claim against Morris.

and argues that at this early stage of the case Morris's apparent waiver of immunity subjected it to suit, even if discovery might ultimately show that the wavier of immunity does not apply to Plaintiff's negligence action.  Plaintiff also argues negligence is not covered by the WCA and that it cannot be bound by the WCA settlement because it was not a party thereto.

The Court first addresses whether Plaintiff may pursue a claim against Morris for negligence in light of 77 P.S. § 481.  This statutory provision addresses the exclusivity of remedy in the Pennsylvania WCA.  Under § 481, "[t]he liability of an employer under [the] act *shall be exclusive and in place of any and all other liability to such employees*, his legal representative, husband or wife, parents, dependents, next of kin or anyone otherwise entitled to damages in any action at law or otherwise on account of any injury or death as defined in section 301(c)(1) and (2) or occupational disease as defined in section 108."  *Id.* § 481(a).  Section 481 represents a trade-off in that employees who are injured get the benefit of a "statutory, no-fault system of compensation" in return for giving up the rights to other remedies.  *Herold v. Univ. of Pittsburgh - of the Commw. Sys. of Higher Educ.*, 329 A.3d 1159, 1183 (Pa. 2025) (quoting *Poyser v. Newman & Co., Inc.*, 522 A.2d 548, 550 (Pa. 1987)); *Hartwell v. Allied Chem. Corp.*, 320 F. Supp. 75, 77 (W.D. Pa. 1970) (under the WCA, "an employee gains a right which he did not have at common law but surrenders another" insofar as "[h]e acquires a right to compensation for an occupational injury regardless of whether the injury is caused by his employer's negligence, but, in return, he yields his right to sue his employer in a common law action for negligence").  This exclusivity of remedy precludes any employee from obtaining "recourse against the employer at common law for negligence."  *Id.* at 1183.  Thus, as a general matter, Plaintiff may not pursue a negligence claim for Melendez's work-related injury.[15]

---

[15]    One of Plaintiff's arguments to get out from under the exclusivity of remedy is that the WCA does not "account for a claim of negligence, nor does it provide for damages such as pain and suffering."  (Docket

Despite this, Plaintiff argues that he can bring a direct claim of negligence against Morris because "Morris Painting … expressly waived [its] Worker's Compensation immunity via contract with the Utility Defendants." (Docket No. 75 at 2). Under Pennsylvania law, employees or their next-of-kin may bring a claim related to injuries or death caused by third parties even though employers, their insurance carriers, their servants/agents/employees/representatives may not be liable to third parties for damages, contribution, or indemnity. 77 P.S. § 481(b). The only exception provided by statute is that an employer can "expressly provide[] for [liability for damages, contributions, or indemnity] in a written contract entered into by the party alleged to be liable prior to the date of the occurrence which gave rise to the action." *Id.* That is, while the workers' compensation "statute immunizes employers from indemnification suits by third parties who have been sued by injured employees, it exempts from protection any employers that contractually agreed with third parties to waive their immunity under the statute." *Kiewit E. Co. v. L & R Const. Co.*, 44 F.3d 1194, 1200 (3d Cir. 1995). Based on the language in the Painting Contract's indemnity provision and "Waiver of Immunities" in it, Plaintiff argues that the Court should apply the *Bester* test and that, under such test, the Court should determine waiver of immunities by contract is adequately alleged, and the direct suit against Morris should not be dismissed on the present motion. (Docket No. 75 at 9).

In *Bester*, a construction company leased a crane from Essex Crane for the construction of a terminal at the Pittsburgh airport. *Bester v. Essex Crane Rental Corp.*, 619 A.2d 304, 306 (Pa.

---

No. 75 at 4). However, as indicated by the discussion of exclusivity of remedy above, employees give up the opportunity to pursue, *e.g.*, negligence claims as part of the trade-off represented by the WCA. "In Pennsylvania, the [WCA] is the only avenue for an injured employee (**or their estate**) to collect damages for an on-the-job injury or death." *Montgomery v. Bobst MEX SA*, No. CV 24-367, 2024 WL 3939303, at *4 (E.D. Pa. Aug. 26, 2024) (citing 77 P.S. § 481(a)) (emphasis added). For that reason, Plaintiff's argument that a negligence claim is pursuable because it is not addressed by the WCA is a non-starter.

Super. Ct. 1993). Bester was an employee of the construction company, Russell Construction. *Id.* When an Essex Crane employee delivered the leased crane, he accidentally struck Bester with a sledgehammer. *Id.* Bester sued Essex Crane, and Essex Crane sought to join Russell Construction based on an indemnification clause in the leasing agreement. Addressing joinder, the Pennsylvania Superior Court explained that because Russell Construction was the employer, under the WCA, "any indemnity in favor of Essex Crane would have to be expressly provided for in a written contract." *Id.* (citing 77 P.S. § 481(b)). Such a waiver would have to be specific because case law in Pennsylvania has "established that the indemnity provision in the Workmen's Compensation Act must be construed strictly, and general indemnity language such as 'any or all' or 'any nature whatsoever' is insufficient." *Id.* at 307. That is not to say that an indemnity agreement must specifically waive immunity provided by § 481, but "the intent to indemnify against claims by employees of the alleged indemnitor … must clearly appear from the terms of the agreement." *Id.* Put differently, the language that would waive WCA immunity must specifically demonstrate "that a named employer agrees to indemnify a named third party from liability for acts of that third party's own negligence which result in harm to the employees of the named employer." *Id.* at 308-09; *Jones v. Swepi L.P.*, No. 2:19-CV-00050, 2020 WL 241009, at *3 (W.D. Pa. Jan. 16, 2020) ("Under the *Bester* test, an employer only waives its statutory immunity if it does so expressly and unequivocally in the contract.").

Plaintiff argues that Morris waived its immunity and is thus vulnerable to suit by Melendez's estate. In Article 9 of the Painting Contract, Morris and FESC addressed indemnification and agreed that Morris would "indemnify, defend, and hold harmless [FESC] … from and against any and all … claims, liabilities, fines, penalties, and expenses … which any of the Indemnified Parties may suffer or incur, arising out of or related to the Work and/or the actions

or omissions of [Morris] … including Losses relating to: (1) actual or alleged bodily or mental injury to or death of any person; … or (5) any violation by [Morris] … of any ordinance, regulation, rule, or law of the United States or any political subdivision or duly constituted public authority; … provided, however, that [Morris's] indemnity obligations under this Article 9(A) shall not apply to any Losses to the extent such Losses are found to have been caused by the negligence or willful misconduct of any of the Indemnified Parties."  (Docket No. 45-2 at 9).  For immunities, Morris and FESC agreed that in the event a Morris employee "or such employee's heirs, assigns, or anyone otherwise entitled to receive damages by reason of injury or death to such employee, *brings an action at law against any Indemnified Party*, then [Morris], … hereby expressly waives any provision of any workers' compensation act or other similar law whereby [Morris] could preclude its joinder by such Indemnified Party as an additional defendant in such actions, or avoid liability for damages, contribution, defense, or indemnity in any such action at law, or otherwise."  (*Id.* (emphasis added)).  The provision on immunities goes onto say that Morris's "obligation to [FESC] under this Article 9 shall not be limited by any limitation on the amount or type of damages, benefits or compensation payable by or for [Morris] under any worker's compensation acts, disability benefit acts, or other employee benefit acts on account of claims against [FESC] by an employee of [Morris] or anyone employed directly or indirectly by [Morris] or anyone for whose acts [Morris] may be liable."  (*Id.* (emphasis added)).

The Court finds Plaintiff's argument regarding the Painting Contract, and Morris's waiver of immunity, untenable most of all because Morris's waiver of immunity therein pertains to actions at law brought against an Indemnified Party.[16]  This is not such an action and the Court has no

---

[16]    "Under Pennsylvania law, the interpretation of contractual language to determine the parties' intent is a question of law, and the meaning of a contract is determined by the contractual language, unless it is ambiguous."  *Austin Powder Co. v. Popple Const., Inc.*, 167 F. App'x 931, 934 (3d Cir. 2006) (citation omitted).  The Painting Contract includes a governing law provision that identifies Ohio law as governing.

basis for taking the indemnity and immunity provisions in a contract between Morris and FESC and construing them in this suit to permit a direct negligence action against Morris notwithstanding the WCA. Considering this determination, it is likely unnecessary for the Court to address certain other matters raised by the parties but, for the sake of clarity, the Court makes several additional observations on the parties' arguments. As for the argument that Plaintiff's suit is barred by res judicata in light of Melendez's parents execution of the Compromise and Release Agreement and Death Claim Supplement to the Compromise Release Agreement, the Court notes that Plaintiff argues res judicata would not apply because, among other reasons, the Estate was not a party to the settlement. But courts have held that the WCA is the "only avenue for an injured employee (*or their estate*) to collect damages for an on-the-job … death." *Montgomery*, 2024 WL 3939303, at *4 (emphasis added).[17] More fundamentally, if the Estate could pursue a negligence claim despite the prior settlement among Morris and Melendez's parents, it is unclear how Plaintiff has or could factually allege a "duty" of Morris to the Estate, a critical element of his claim. *Merlini*, 980 A.2d at 506. For these and the foregoing reasons, the Court will grant Morris's motion to dismiss the claim against it.

Regarding Morris's request for dismissal with prejudice and Morris's motion for sanctions, the Court will not go so far as to impose sanctions because notwithstanding Plaintiff's seeming concession at Oral Argument that there was no claim to pursue against Morris, the concession was

---

Pennsylvania and Ohio law are consistent with respect to contract interpretation being a question of law. *Id.* at n. 1.

[17] Additionally, Plaintiff is pursuing this negligence action against Morris pursuant to Pennsylvania's Wrongful Death and/or Survival Acts, which permit certain relatives to recover economic loss wrought by a death (wrongful death) and the estate to recover for the decedent's pain and suffering (survival act). *Conley ex rel. Est. of Kerr v. Ethex Corp.*, No. CIV.A. 10-1455, 2012 WL 32445, at *5 (W.D. Pa. Jan. 5, 2012). When Melendez's interests and his parent-beneficiaries' interests were represented in the WCA action and settlement, it is unclear how the Estate could separately pursue a claim against Melendez's employer despite the decedent's and beneficiaries' release of claims.

not unequivocal, the allegations in the FAC do not appear to have been made for any improper purpose, and the legal arguments presented by Plaintiff in opposition to Morris's motion to dismiss are not frivolous.  Fed. R. Civ. P. 11.  That said, the Court will dismiss the claim against Morris with prejudice because in light of the Court's analysis in this Memorandum Opinion, it is clear to the Court that giving Plaintiff further opportunity to amend a direct claim against Morris would be futile.  *See Shane v. Fauver*, 213 F.3d 113, 115 (3d Cir. 2000) (futility of amendment means even with amendment the complaint would fail to state a plausible claim).

## IV.    Conclusion

For all these reasons, the Court will order that Defendant Morris Painting's Motion to Dismiss will be granted and Plaintiff's claim against Morris Painting will be dismissed with prejudice.  The Court will deny Morris Painting's motion for sanctions (Docket No. 76).  The Court will grant the Utility Defendants' motion and dismiss Plaintiff's claims of negligence against the Utility Defendants without prejudice except with respect to Defendants that do not appear to exist—ATSI d/b/a FirstEnergy, First Energy of PA, LLC, Penn Power, and Ohio Edison—as to which Plaintiff's claim is dismissed with prejudice.[18]  As for Defendant Biasucci, the Court will dismiss the claim against him without prejudice.  And the Court will dismiss the claim against Krauss without prejudice.

*/s/ W. Scott Hardy*
W. Scott Hardy
United States District Judge

cc/ecf:  All counsel of record

---

[18]    The Court's dismissal *with prejudice* as to Defendants Penn Power and Ohio Edison is not to be confused with its dismissal *without prejudice* as to Defendants Penn Power Company and Ohio Edison Company.